## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

LAMPTON WELDING SUPPLY CO, ) 
INC., )
 )
       **Plaintiff,** )
 )
vs. )     **Case No. 11-CV-319-TCK-TLW**
 )
DONALD R. STOBAUGH, MICHAEL ) 
L. HIGGINS, and TULSA GAS & )
GEAR, L.L.C. )
 )
      **Defendants.** )

## OPINION AND ORDER

Before the Court are Defendants' Motion to Dismiss First Amended Complaint (Doc. 43);

Lampton Welding Supply Co., Inc.'s Motion for Partial Summary Judgment (Doc. 46); Defendants

Donald Stobaugh and Tulsa Gas & Gear, L.L.C.'s Motion for Summary Judgment (Doc. 48); and

Defendant Michael Higgins' Motion for Summary Judgment (Doc. 49).

**I.    Defendants' Motion to Dismiss**

    **A.    First Amended Complaint**

In the First Amended Complaint, Plaintiff Lampton Welding Supply Co. ("LWS"), a

corporation owned by Marvin Lampton ("Lampton"), alleges the following facts. On July 31, 1995,

LWS, Donald Stobaugh ("Stobaugh"), and Michael Higgins ("Higgins") entered into a shareholders'

agreement ("Shareholders' Agreement"), whereby LWS acquired 240,000 shares of Alloy Welding

Supply, Inc. ("Alloy") stock. This represented 40% of all issued and outstanding stock of Alloy. At

the time of signing the Shareholders' Agreement, Stobaugh and Higgins each owned 180,000 shares

of Alloy stock, which collectively represented 60% of all issued and outstanding stock of Alloy.

Stobaugh was President of Alloy and a member of its Board of Directors,  and Higgins was Vice-

President of Alloy and a member of its Board of Directors.

Pursuant to the Shareholders' Agreement, if on August 1, 2010, LWS, Stobaugh, and Higgins all still owned their Alloy stock, then LWS was to purchase Stobaugh and Higgins' shares.  If the share price was not agreed upon by August 1, 2010, Higgins and Stobaugh could designate their appraiser by a date certain. LWS then had ten days within which to designate its appraiser. If Stobaugh/Higgins and LWS each designated an appraiser, those two appraisers would designate a third appraiser.  Each of the three appraisers were to determine the market value of the Alloy shares, and the final fair market value would be the average of the two appraisals that were closest in amount.

Lloyd Hyle ("Hyle") and Johnny Stamps ("Stamps) were key management employees of Alloy.  At the time of the stock sale, Hyle was Director of Outside Sales, and Stamps was General Manager.  Hyle and Stamps were active participants in the management of Alloy and collectively worked with Stobaugh and/or Higgins as Alloy's management team.  In 2008, Alloy entered into Non-Compete and Nondisclosure Agreements with Hyle and Stamps ("NCAs").  Hyle and Stamps agreed that, during their employment with Alloy and for a period of one year after termination, they would not, for purposes of competing with Alloy, contact or deal with any business or person within a 100-mile radius of Alloy's principal place of business that had been a customer of Alloy or had become known to them as a prospective customer of Alloy.  These parties also entered into Addendums to the Non-Compete Agreements ("Addendums"), which provided that a reduction of the employee's salary or benefits, as set forth in the Addendums, would void the NCAs.

On or about November 1, 2009, the base salaries of all Alloy employees were reduced, including Hyle and Stamps.  On or about October 1, 2010, the base salaries of all Alloy employees were reinstated to their prior levels.  As a result of the temporary reduction of Hyle and Stamps' base salaries, the NCAs were purportedly voided and rendered unenforceable.  At no time did Stobaugh,

Higgins, or anyone else at Alloy inform Lampton that all employees' base salaries were reduced during this period or that the NCAs were purportedly voided.  On or around July 23, 2010, Stobaugh and Higgins provided copies of the NCAs to Lampton and represented that such agreements were valid.

In the fall of 2010, a disagreement arose over Stobaugh and Higgins' compliance with the appraisal provisions of the Shareholders' Agreement.  This disagreement resulted in litigation styled *Lampton Welding Supply, Inc. v. Alloy Welding Supply, Inc., Michael L. Higgins and Don Stobaugh*, Case No. 10-CV-733-GKF-TLW ("Appraisal Litigation").  During the Appraisal Litigation, LWS, Stobaugh, Higgins, and Alloy executed a document entitled Second Amendment to Shareholders' Agreement ("SASA").  The SASA provides that, in order to facilitate appraisal of the Alloy stock, various documents and other information would be provided to LWS and the three designated appraisers.  Included in the documents that Stobaugh, Higgins, and Alloy agreed to provide were "[c]opies of all employment agreements and contracts that will survive and continue beyond August 1, 2010, together with a schedule of employees, date hired, current compensation, and fringe benefits (including 401(k) plan, profit sharing plan, health insurance and life insurance)."  This provision was included in the SASA because Stobaugh and Higgins had previously resisted providing documentation necessary for the appraisal.  Ultimately, Stobaugh and Higgins designated Car, Riggs and Ingram ("CRI") as their appraiser.  LWS designated Adams Brown Beran & Ball ("ABBB") as its appraiser.  Together, CRI and ABBB designated Curzon, Cumby and Kunkel ("CCK") as the third appraiser (collectively the "Appraisers").

In or around December of 2010, LWS alleges that Hyle approached Stobaugh about the possibility of joining him in a welding gas and supply company following the stock sale.  In early

January 2011, Stobaugh allegedly learned that his son and fellow Alloy employee, Steve Stobaugh, and his wife, along with Hyle and Stamps, were purchasing commercial property in Sapulpa.

On or about January 5, 2011, representatives of ABBB met with Stobaugh, Higgins, Steve Stobaugh, and others to gather information for use in appraising the value of Alloy's stock ("January 5 Meeting"). During the January 5 Meeting, ABBB asked the Alloy representatives about various risk assessments that should be considered in the appraisal, including the stability of key employees, key customer risks, and competitive encroachment.  At no time during the January 5 Meeting did Stobaugh, Higgins, or any Alloy representative inform ABBB of the salary reductions or that the NCAs were considered by anyone at Alloy to be invalid. At no time during the January 5 Meeting did Stobaugh, Higgins, or any Alloy representative inform ABBB that Stobaugh and/or any other Alloy employees intended to (1) start a new business in the Sapulpa area to sell welding and specialty gases and related equipment and supplies, or (2) solicit current Alloy employees to invest in or work for this new company.  LWS alleges that, during or shortly after the January 5 Meeting, Steve Stobaugh, on behalf of Stobaugh and Higgins, forwarded a copy of the non-compete and nondisclosure form agreement that Alloy used with all of its employees but did not include or otherwise identify the Addendums applicable to Hyle and Stamps.

Upon LWS's information and belief, representatives of CRI and CCK also met with Stobaugh and Higgins to gather information for use in appraising the fair market value of Alloy's stock.  Neither Stobaugh nor Higgins informed the representatives of CRI or CCK that the NCAs were considered by anyone at Alloy to be void or invalid or that Hyle, Stamps, Stobaugh, and/or Higgins intended to (1) start a new business in the Sapulpa area to sell welding and specialty gases and related equipment and supplies, or (2) solicit current Alloy employees to invest in or work for this new company.

4

On or about January 10, 2011, Stobaugh and Higgins had certain documents forwarded to Lampton and the Appraisers in accordance with the SASA.  Included in the documents provided were the NCAs, and such were represented to be valid agreements.  During the course of discussions between LWS, Stobaugh, and Higgins that led to the SASA, Lampton requested that Stobaugh and Higgins enter into non-compete agreements with Alloy.  Stobaugh and Higgins declined to enter into any non-compete agreements, instead representing to Lampton that neither Stobaugh nor Higgins had any intention to and would not in any way compete with Alloy after the close of the stock sale. Lampton and LWS relied on Stobaugh and Higgins' representation that they would not compete with Alloy and dropped its request for non-compete agreements with Stobaugh and Higgins.

Lampton believed that Hyle and Stamps were the two most important members of the Alloy management team. Prior to March 9, 2011, Lampton offered to promote Hyle to President of Alloy and intended that Hyle would promote Stamps to Vice President of Alloy upon the completion of the stock purchase.  The Appraisers assigned value to the Alloy stock based on the belief that Hyle and Stamps had enforceable NCAs and that both Stamps and Hyle would be active in the management of Alloy.

In or around late February 2011, the Appraisers each completed their appraisal. CRI appraised the value of the Alloy stock at $18.78 per share, ABBB appraised the value of the Alloy Stock at $8.33 per share, and CCK appraised the value of Alloy stock at $11.77 per share.  Pursuant to the original Shareholders' Agreement, the share price was the average the appraised value as determined by ABBB and CCK, or $10.05 per share.  LWS closed on the purchase of Stobaugh and Higgins' Alloy stock on March 9, 2011. Stobaugh and Higgins were each paid $1,809,000.00 for their 180,000 shares.

5

Upon LWS's information and belief, prior to March 9, 2011, Stobaugh began efforts and preparations to form a new company, Tulsa Gas & Gear ("TGG"), to sell welding and specialty gases and related equipment and supplies and to be a direct competitor of Alloy.  Such planning allegedly included preparations for forming TGG and recruitment of employees from Alloy, such as Steve Stobaugh, Hyle, and Stamps, to invest in and/or work for TGG.  At no time prior to the March 9, 2011 closing of the stock purchase did Stobaugh or Higgins reveal to Lampton or the Appraisers the following: (1) that Alloy had reduced base salaries from November 1, 2009 to October 1, 2010; (2) that Stobaugh, Higgins, or anyone at Alloy believed that the NCAs were void; (3) that Hyle had alerted Stobaugh in or around December of 2010 of his interest in starting his own welding supply business after Alloy was sold; (4) that Hyle, Stamps, Steve Stobaugh, and Stobaugh's wife had purchased commercial property in Sapulpa, presumably for the purpose of forming a competing welding gas and supply company that later became TGG; (5) that Stobaugh was aware that other Alloy employees were taking steps to establish a new company in the Sapulpa area to compete directly with Alloy; or (6) that Stobaugh would join other Alloy employees in forming the new company and that Stobaugh would solicit Alloy employees to terminate their employment with Alloy and to invest in and/or work for the new company.

On March 9, 2011, the same day Stobaugh and Higgins closed on the stock sale, TGG was registered with the Oklahoma Secretary of State.  Shortly thereafter, TGG opened a facility less than five miles from Alloy's principal place of business.  Upon LWS's information and belief, Stobaugh owns, controls, or has a financial interest, either directly or indirectly, in TGG.  Also on March 9, 2011, the parties stipulated to dismissal of the Appraisal Litigation.

On April 29, 2011, Alloy sued TGG and five former Alloy employees in Tulsa County District Court, including Hyle and Stamps, alleging breach of the NCAs and seeking damages and

injunctive relief ("Alloy Litigation").  Alloy filed a Motion for Temporary Restraining Order, which was never ruled upon by the court.  The Alloy Litigation docket sheet, at least as of March 2012, indicates that there has been little to no activity in the case since it was filed.  No scheduling order has been entered.

On May 23, 2011, LWS filed this action.  In its First Amended Complaint, LWS asserts seven causes of action.  First, LWS alleges that Stobaugh and Higgins breached the SASA by (1) failing to disclose that Hyle and Stamps' compensation had been diminished, thereby voiding their NCAs; (2) failing to disclose Stobaugh's knowledge, intentions, efforts, and actions to invest in or establish a competitor to Alloy; (3) failing to disclose that Stobaugh was soliciting Alloy employees to be employed by a new company in which Stobaugh owned an interest; and (4) failing to operate Alloy in the ordinary course ("breach of contract claim").

Second, LWS alleges that Stobaugh and Higgins (1) impliedly agreed not to employ Hyle and Stamps in competition with Alloy when they asserted the enforceability of the NCAs and accepted the benefit of an inflated stock price; and (2) Stobaugh, Higgins, and/or  TGG breached such implied agreement by inducing Hyle and Stamps to terminate their employment with Alloy, accept employment with TGG, and solicit business from Alloy customers ("breach of implied contract claim").

Third, Lampton alleges that Stobaugh and Higgins made material misrepresentations of fact to LWS and the Appraisers and/or failed to disclose material facts, including (1) the viability of the NCAs, (2) efforts and preparations by Stobaugh to invest in or form a competitor of Alloy, and (3) Stobaugh's efforts to solicit Alloy employees to invest in or accept employment with a new company in which Stobaugh owns an interest ("actual fraud claim").  Fourth, LWS alleges that

Stobaugh and Higgins committed constructive fraud by presenting the voided NCAs to LWS and/or the Appraisers ("constructive fraud claim").

Fifth, LWS alleges that it is entitled to recover the reasonable value of benefits derived by Stobaugh and Higgins from their material misrepresentations to LWS and the Appraisers under the equitable doctrine of unjust enrichment ("unjust enrichment claim"). Sixth, LWS alleges that Stobaugh breached a fiduciary duty when he withheld relevant information from LWS and the Appraisers ("breach of fiduciary duty claim"). Finally, Lampton seeks an injunction restraining TGG, Stobaugh, and Higgins from (1) soliciting current customers of Alloy for the one-year period following Hyle and Stamps' employment with Alloy; and (2) disclosing proprietary information of Alloy obtained by Stobaugh, Hyle, or Stamps during their employment with Alloy.

**B.      Discussion**

Defendants moved for dismissal of all claims pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that: (1) LWS has failed to state any claim for relief; (2) the Court should abstain from deciding this action based on the *Colorado River* abstention doctrine and the pending Alloy Litigation; and (3) LWS's claims are precluded because they could have been raised in the Appraisal Litigation.

**1.      Failure to State a Claim**

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the plaintiff has stated a claim upon which relief may be granted. The inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544)). In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must "'nudge [ ] [his] claims across the line from conceivable to plausible.'" *Schneider*, 493 F.3d at 1177 (quoting

*Twombly*, 127 S. Ct. at 1974).  Thus, "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."  *Schneider*, 493 F.3d at 1177.

In their motion to dismiss, Defendants argue that LWS's claims are "based on the faulty assumption that Defendants had a duty to inform Lampton that the non-compete agreements with Hyle and Stamps were unenforceable."  (Defs.' Mot. to Dismiss 3.)  Defendants also argue that the NCAs were unenforceable under Oklahoma common law and that any non-disclosure regarding the salary reductions was therefore harmless.

First, the Court concludes that Defendants have failed to meet their burden of showing that the First Amended Complaint fails to state any plausible claim for relief.  The motion to dismiss fails because it is not directed to any particular claim and does not explain how the "lack of duty" argument explained above  negates the elements of any particular claim.  For example, LWS alleges a breach of contract claim.  Such claim does not have a "duty" element; it will instead turn upon the terms of the contract.   In addition, actual fraud does not have a "duty" element.  Thus, even assuming Defendants are correct that they had no legal "duty to inform Lampton that the non-compete agreements with Hyle and Stamps were unenforceable," this does not necessarily warrant dismissal of all claims.

Second, construing the motion to dismiss for failure to state a claim as limited to the constructive fraud/breach of fiduciary duty claims, both of which have a "duty" element, the motion must be denied.  The motion focuses exclusively on the alleged non-disclosures/misrepresentations regarding the NCAs.  The motion to dismiss ignores that LWS has alleged several other bases for constructive fraud/breach of fiduciary duty, including failure to disclose facts regarding Stobaugh's

9

intentions to form TGG, Hyle's intentions to leave Alloy following the stock sale, and Stobaugh's family members' alleged purchase of commercial property during the appraisal process.  Again, assuming Defendants are correct as to the non-enforceability of the NCAs, Defendants have not shown entitlement to dismissal of the constructive fraud and/or breach of fiduciary duty claims.

Finally, the NCAs' actual enforceability under Oklahoma common law is not a legal question that requires resolution in this lawsuit.  In this litigation, LWS does not seek to enforce the NCAs. It seeks money damages flowing from LWS's and/or the Appraisers' reliance on the NCAs in valuing the stock.  Assuming the NCAs were entirely unenforceable even prior to the salary reductions, this does not necessarily lead to the conclusion that any misrepresentations or non-disclosures related to such agreements were harmless.  LWS may attempt to prove that presentation of the NCAs as enforceable caused it financial harm, and the question of actual legal enforceability is simply not before the Court.  Again, therefore, even accepting Defendants' legal premise as accurate, Defendants have failed to demonstrate that such premise warrants dismissal of any claims for relief.

## 2. *Colorado River* Doctrine

"The *Colorado River* doctrine applies to situations involving the contemporaneous exercise of concurrent jurisdictions . . . by state and federal courts." *Fox v. Maulding*, 16 F.3d 1079, 1080 (10th Cir. 1994) (internal citations omitted).  Although not a true form of abstention, the doctrine is often treated as a form of abstention and is governed by the general principle that abstention from the exercise of federal jurisdiction is the exception, not the rule.  *See id.*  "The doctrine permits a federal court to dismiss or stay a federal action in deference to pending parallel state court proceedings, based on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Id.* (internal quotation omitted).

10

The decision of whether to dismiss or stay under the *Colorado River* doctrine rests in the discretion of the district court. *Id.* at 1081. However, federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given them, and "declining to exercise jurisdiction based on the *Colorado River* doctrine is appropriate only in exceptional circumstances." *Id.* This is because, "in the absence of weightier considerations of constitutional adjudication and state-federal relations, the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention." *Id.* (quotation omitted) (citing *Colorado River*, 424 U.S. at 817-18).

As the first step in the analysis, a court must determine whether the state and federal proceedings are parallel. *Id.* Suits are parallel "if substantially the same parties litigate substantially the same issues in different forums." *Id.* (quotation omitted). In determining whether state and federal proceedings are parallel, the Tenth Circuit has instructed courts "to examine the state proceedings as they actually exist ," as opposed to examining how the state proceedings "could have been brought in theory." *Id.* This approach is preferred by the Tenth Circuit because, in order to stay or dismiss based on the *Colorado River* doctrine, the state court litigation must be an "adequate vehicle for the complete and prompt resolution of the issue between the parties." *Id.* If the *Colorado River* doctrine is invoked, a federal court should "have nothing further to do in resolving any substantive part of the case." *Id.* at 1081-82 (quotations omitted). Only if the suits are parallel does a court analyze whether "exceptional circumstances" exist to justify a stay or dismissal under the *Colorado River* doctrine. *Fox*, 16 F.3d at 1081.

The Alloy Litigation and this case are not parallel. First, the two most crucial parties in this litigation – LWS and Stobaugh – are not parties to the Alloy Litigation. While LWS could have

joined in the suit with Alloy and also could have named Stobaugh as a defendant, it elected not to do so. The Court must consider the Alloy Litigation in its existing state and not its potential state. As they currently exist, the two lawsuits do not involve substantially the same parties. Second, the Alloy Litigation is not an adequate vehicle for the complete and prompt resolution of all issues presented in this case. One question in this litigation is whether LWS suffered damages in the form of paying an inflated stock purchase price as a result of Defendants' conduct. Alloy has not and cannot recover these damages because Alloy did not pay for the stock. Were this Court to abstain under the *Colorado River* doctrine, there would be substantive issues left for the Court to resolve at the conclusion of the Alloy Litigation. Therefore, the two suits are not parallel, and the Court finds no reason to dismiss or stay the case in deference to the Alloy Litigation.

### 3.     Claim Preclusion

Defendants' final argument is that all of Lampton's claims are barred because they could have been raised in the Appraisal Litigation. Under the doctrine of claim preclusion, also known as *res judicata*, a final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been raised in that action. *Pelt v. Utah*, 539 F.3d 1271, 1281 (10th Cir. 2008). The elements of claim preclusion are: "(1) a final judgment on the merits in an earlier action; (2) identity of parties or privies in the two suits; and (3) identity of the cause of action in both suits." *Id.* (internal quotations omitted). Even where these elements are satisfied, claim preclusion does not apply unless the litigant had a full and fair opportunity to litigate the claim in the prior suit. *Plotner v. AT & T Corp.*,  224 F.3d 1161, 1170 n.4 (10th Cir. 2000) (explaining that some courts characterize the "full and fair opportunity" question as a fourth element, while others characterize it as an exception, but that it makes little difference in practice). "Generally, claim preclusion is an

affirmative defense and it is incumbent upon the defendant to plead and prove such a defense." *Pelt*, 539 F.3d at 1283.

LWS challenges whether Defendants can demonstrate the third element – namely, identity between the cause of action in the Appraisal Litigation and this lawsuit.  The Tenth Circuit has adopted the "transactional approach" to this element, which means that a "cause of action" includes "all claims or legal theories of recovery that arise from the same transaction, event, or occurrence." *Plotner*, 224 F.3d at 1170 (internal quotations omitted).  Thus, when a claim arises from the same transaction as that underlying the first lawsuit but is simply presented "under the rubric of slightly different legal theories," it is precluded.  *Id.*  (holding that the "transaction" was the sale of certain property and that the new claims for relief, "although now stated under new legal theories, all ultimately relate to a claim that defendants' wrongdoing reduced the price she received for that property – an issue squarely before the court in [the prior case]").

Defendants cannot demonstrate the third element of claim preclusion.  The "transaction" at issue in the Appraisal Litigation was enforcement of the Shareholder Agreement for purposes of completing the stock sale.  Specifically, LWS sought a declaratory judgment mandating the appointment of a single receiver and gaining the necessary access to books and records to appraise the value of the Alloy stock, after Stobaugh and Higgins allegedly refused to fully cooperate in the appraisal process.  One result of the Appraisal Litigation was the parties' execution of the SASA. The "transaction" at issue in this case is the alleged breach of the SASA and fraud that took place during the appraisal process.  In the Court's view, although both cases *generally* relate to the stock sale, the two cases cannot be said to involve the same "cause of action."  One was meant to facilitate the stock sale (and was terminated upon closing of the stock sale), while the other was meant to remedy breaches and fraud that allegedly occurred during the stock sale.

13

Further, whether viewed as a fourth element of claim preclusion or as an exception, LWS did not have a full and fair opportunity to litigate its claims in the Appraisal Litigation. The parties stipulated to dismissal of that case on March 9, 2011, the closing date of the stock sale. LWS contends that it did not discover the breaches and fraud alleged in this case until after that date – namely, until during prosecution of the Alloy Litigation. Although Defendants argue that LWS should have discovered the non-enforceability of the NCAs prior to March 9, 2011 and could have asserted those claims in the Appraisal Litigation, this argument again ignores the larger scope of LWS's claims in this case. The allegations are that Defendants undertook an overall scheme to defraud LWS and inflate the stock price, including misrepresentations and omissions regarding the commercial property contract, Stobaugh's intentions regarding TGG, and the non-enforceability of the NCAs. LWS did not have a full and fair opportunity to litigate all such claims prior to March 9, 2011, and claim preclusion does not apply.

Defendants' Motion to Dismiss First Amended Complaint (Doc. 43) is DENIED in its entirety.

## II.    Defendants' Motions for Summary Judgment and LWS's Motion for Partial Summary Judgment

### A.    Factual Background

The allegations in the First Amended Complaint, as set forth *supra* Part I.A., are incorporated by reference as background information pertaining to the summary judgment motions. Such facts are not, however, accepted as true for purposes of the following summary judgment analysis. Where necessary, the Court will explain and set forth the facts contained in the summary judgment record.

**B.      Standard**

Summary judgment is proper only if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact exists. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006). The Court resolves all factual disputes and draws all reasonable inferences in favor of the non-moving party. *Id.* However, the party seeking to overcome a motion for summary judgment may not "rest on mere allegations" in its complaint but must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The party seeking to overcome a motion for summary judgment must also make a showing sufficient  to establish the existence of those elements essential to that party's case. *See Celotex Corp. v.  Catrett*, 477 U.S. 317, 323-33 (1986). The relevant legal standard does not change where the parties file cross motions for summary judgment, and each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

**C.      Breach of Contract (Stobaugh, Higgins)[1]**

On December 24, 2010, as a direct result of the Appraisal Litigation, LWS, Stobaugh, Higgins, and Alloy entered into the SASA. Such agreement identifies the Alloy Litigation as the "pending litigation" and grants Alloy, Stobaugh, and Higgins an extension of time to answer until the closing date of the stock sale. It also provides that, if the closing has not occurred by a certain date, LWS may proceed with the litigation or exercise other options. With respect to cooperating

---

[1]   The parenthetical following each cause of action indicates the defendants against whom the claim is asserted.

with the Appraisers, the contract imposes specific and detailed obligations upon Stobaugh and

Higgins.  Specifically, Section 3(c) of the SASA ("§ 3(c)") provides in relevant part:

> (c)      Providing of Information.  As soon as possible following the Effective Date,
> the Company, Higgins and Stobaugh shall provide the following information to (1)
> LWS, (2) Carr, Riggs & Ingram, LLC, the appraiser appointed by Higgins and
> Stobaugh, (3) Adams Brown Beran & Ball Chartered, the appraiser appointed by
> LWS, and (4) Curzon, Cumbey & Kunkel, PLLC, the appraiser appointed by the
> other appraisers:
> . . .
> (v)      Copies of all employment agreements and contracts that will survive and
> continue beyond August 1, 2010, together with a schedule of employees, date hired,
> current compensation, and fringe benefits (including 401(k) plan, profit sharing plan,
> health insurance and life insurance).
> . . .
>
> (viii)   A summary of operations, including (A) key personnel, key customers, past
> and future growth rates, and (B) an assessment of cyclical risk, risk of competitive
> encroachment, and operating concentrations.
> (ix)     The information necessary for the appraisers to understand how the change
> in ownership will affect future operations and cash flow.
> (x)      A list of any anticipated changes in future operations, products, personnel or
> employment policies, together with any information regarding adjustments necessary
> to normalize prior officer compensation and bonuses with future operations.
> . . .
> (xii)    A list of all contracts and product service agreements with customers, setting
> out the expiration date of each agreement, together with copies of all of the
> agreements.
> . . . .

(*Id.*)  Higgins and Stobaugh also agreed to be interviewed by the appraisers.  The parties also

"agree[d] to reasonably cooperate with each other and with the appraisers in providing this

information and reasonable access to such information and other information reasonably requested"

through the closing date.  (*Id.*)

In their motions for summary judgment, Stobaugh and Higgins argued that they cannot be

liable for breach of contract because the SASA did not contractually obligate them to render any

"legal opinions" to LWS regarding the NCAs.  Even if true, this does not entitle Stobaugh and

Higgins to summary judgment.  LWS does not contend that Stobaugh and Higgins breached §

16

3(c)(v) by providing the NCAs and then failing to opine on their legal enforceability.  LWS contends that, by providing the NCAs when they knew or should have known that such agreements were void due to Hyle and Stamps' prior salary decrease, they breached their agreement to provide copies of only those agreements that "will survive and continue beyond August 1, 2010."

Stobaugh and Higgins also argued that they cannot be liable for breach of contract because Lampton and/or the Appraisers also had access to the salary reduction records.  However, this is not material to the question of whether Stobaugh and Higgins fully complied with their own contractual obligations.  The record reflects that Lampton was not involved in the daily operations of Alloy and only reviewed the monthly financial statements.  LWS had incentive to contractually obligate Stobaugh/Higgins to provide certain information to the best of their abilities, even when such information was also technically available to Lampton.  As argued by LWS, at least one purpose of the SASA was to ensure Stobaugh and Higgins provided full disclosures to assist in valuing the stock sale, since Lampton lacked knowledge regarding daily operations and decisions.  Therefore, this argument is unavailing as a defense to the breach of contract claim.

Stobaugh and Higgins further argued that they could not have breached the SASA because the NCAs were unenforceable under Oklahoma common law.  The Court has already rejected this argument, *see supra Part* I.B.1, and nothing in the summary judgment record changes the Court's analysis.  In addition, at least with respect to Stobaugh, the motion ignores the larger scope of LWS's breach of contract claim against him.  The summary judgment record includes evidence that Stobaugh may have known about but failed to disclose several pieces of information relevant to "risk of competitive encroachment," in violation of § 3(c)(viii), and may have known about but failed to disclose that Alloy's bulk gas contracts with American Alloy Steel, Inc. and Energy Exchanger Company had been cancelled, in violation of § 3(c)(xii).  While not an exhaustive list, these

17

examples demonstrate that LWS's breach of contract claim against Stobaugh is not limited to breaches associated with the NCAs.  Accordingly, neither Stobaugh nor Higgins is entitled to summary adjudication on the breach of contract claim.

**D.      Breach of Implied Contract (Stobaugh, Higgins, TGG)**

By statute, an "implied contract is one, the existence and terms of which are manifested by conduct." Okla. Stat. tit. 15, § 33.  Oklahoma law also provides that "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known, or ought to be known to the person accepting." *Id.* § 75; *see also Wattie Wolfe Co. v. Superior Contractors, Inc.*, 417 P.2d 302, 308-09 (Okla. 1966).  When determining whether an implied contract exists, the Oklahoma Supreme Court considers "(a) the parties' acts, conduct and statements as a whole, (b) whether there was a meeting of the minds on the agreement's essential elements, the parties' intent to enter into a contract upon defined terms, and (d) whether one of the parties has relied in good faith upon the alleged contract." *Dixon v. Bhuiyan*, 10 P.3d 888, 891 (Okla. 2000).

LWS explained its implied contract claim as follows:

> Stobaugh represented that Hyle and Stamps' Employment Agreements were valid and would survive and continue beyond August of 2011.  Stobaugh received a benefit from the inflation of the value of his shares of Alloy stock based on that representation.  Stobaugh then partnered with Hyle and Stamps, taking advantage of the fact that they were not restricted by employment agreements that he represented were valid and would continue.  Had Hyle and Stamps gone to work with an organization in which Stobaugh was not involved, they would have been free of the restrictions of the agreements.  In this case, however, Stobaugh entered into an implied agreement that he would treat the Employment Agreements as valid and enforceable , which would have prevented Hyle and Stamps from soliciting Alloy customers for one year after TGG's formation.  In all fairness, Stobaugh ought to be found to have made an agreement to uphold these agreements, at least as to himself and any business from which he benefits.

(Resp. to Stobaugh's Mot. for Summ. J. 19-20 (internal citations omitted).)  This is the same theory asserted against Higgins, except LWS admitted that Higgins has not yet attempted to benefit from the non-enforceability of Hyle and Stamps' NCAs.  (*See* Resp. to Higgins' Mot. for Summ. J. 11.) Although somewhat difficult to understand, the Court interprets LWS's implied contract theory as follows: (1) LWS  and Stobaugh/Higgins entered into an implied contract whereby Stobaugh/Higgins agreed to treat Hyle and Stamps' NCAs as enforceable; (2) they did so by "voluntarily accepting" the benefit of an increased stock price; and (3) they breached such agreement.

Stobaugh and Higgins are entitled to summary judgment on LWS's implied contract claim. Considering the four factors outlined above in *Dixon*, there is no evidence that LWS and Stobaugh/Higgins reached any type of agreement regarding what would occur in the event that (1) the NCAs were actually void; and (2) Stobaugh and/or Higgins formed a competitive company with Hyle and Stamps as co-owners or employees.  The entire theory of LWS's lawsuit is that LWS was misled/not informed about the non-enforceability of the NCAs and the existence of a potential competitor being formed by Alloy employees.  This negates the possibility that LWS or Stobaugh/Higgins somehow impliedly agreed to terms regarding these future possibilities as part of the stock purchase agreement.   LWS cannot enforce an "implied contract," where it was not aware of such agreement or its terms at the time of formation.

In *Wattie Wolf*, the principle case relied upon by LWS, the party seeking to enforce the implied contract performed a service, the other party accepted the service, and then the accepting party refused payment.  At the time of accepting the service, the corresponding obligation (payment) was obvious, and the amount was undisputed.  The court reasoned:

> We think that the circumstances set forth in 15 O.S.1961, Sec. 75, supra, are "circumstances which, according to the ordinary course of dealing and the common

19

understanding of men, show a mutual intent to contract," and that the conduct of the parties in the case at bar manifested the existence of a contract between them for Superior to do all of the work that it did. As mentioned above, there is no question concerning the amount of Wolfe's obligation, if there was a contract covering the entire sewer line ditch.

*Wattie Wolfe*, 417 P.2d at 308-309 (quoting *Ray F. Fischer Co., Inc. v. Loeffler-Green Supply Co., Okla.*, 289 P.2d 139, 141 (Okla. 1955)). Here, Stobaugh and Higgins accepted the stock sale payment. While this was the "voluntary acceptance of the benefit of a transaction," such acceptance cannot obligate Stobaugh and Higgins to the implied terms LWS seeks to impose – namely, enforcement of the NCAs regardless of their legal validity or invalidity. Such term was never impliedly agreed to by the parties at the time of the sale, nor was such obligation obvious to both parties at the time of the stock sale.[2]

With respect to TGG, LWS has not articulated any discernable theory as to how TGG entered into an implied contract with LWS at the time of the stock sale. TGG was not yet in existence, and TGG cannot be bound to any implied contractual terms allegedly created thereby. Thus, all Defendants are entitled to summary adjudication as to this claim.

### E.     Fraud (Stobaugh, Higgins)

Fraud is "a generic term with multiple meanings" and can be applied in either legal or equitable causes of action. *Manokoune v. State Farm Mut. Auto. Ins. Co.*, 45 P.3d 1081, 1086 (Okla. 2006) (quoting *Patel v. OMH Med. Ctr., Inc.*, 987 P.2d 1185, 1199 (Okla. 1999)). Fraud is divided into two categories – actual and constructive fraud. *See Patel*, 987 P.2d at 1199. "[A]ctual fraud" is the "intentional misrepresentation or concealment of a material fact which substantially affects

---

[2]   In addition to the lack of contract formation, LWS has no evidence that Higgins breached the terms of LWS's alleged implied contract because Higgins has no association with TGG and has not employed or attempted to employ Hyle or Stamps.

another person." *Id.* "To constitute actual fraud, there must be an intentional deception." *Faulkenberry v. Kansas City S. Ry. Co.*, 602 P.2d 203, 206 n.6 (Okla. 1979).

In contrast, "[c]onstructive fraud involves the breach of either a legal or equitable duty." *Manokoune*, 45 P.3d at 1086 (internal quotation omitted). Constructive fraud "does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose and may be defined as any breach of a duty which . . . gains an advantage for the actor by misleading another to his prejudice." *Id.* at 1086-87 (internal alteration and quotation omitted); *see Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1180-81 (10th Cir. 2008) (applying Oklahoma law and explaining that, under a theory of constructive fraud, "[t]here is no requirement . . . that the plaintiff prove that the defendant acted with the intent to deceive"); *Patel v. OMH Med. Center, Inc.,* 987 P.2d 1185, 1199 n.49 (Okla. 1999) ("Constructive fraud does not require an intent to deceive, and liability for constructive fraud may be based on negligent or even innocent misrepresentation."); *Gentry v. Am. Motorist Ins. Co.*, 867 P.2d 468, 471 (Okla.1994) ("In contrast with actual fraud, constructive fraud does not require an intent to deceive."); *State ex rel. Okla. Bar Ass'n v. Lloyd*, 787 P.2d 855, 860 n.16 (Okla. 1990) ("Even an innocent misrepresentation may constitute constructive fraud where there is an underlying duty to correctly inform a person of the facts."); *see also* Okla. Stat. tit. 15, § 59 (defining constructive fraud as "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him").

### 1. Constructive Fraud[3]

The elements of constructive fraud are:

_____

[3]    In their briefs, the parties did not present separate arguments regarding LWS's claims for constructive fraud and actual fraud. The Court finds it necessary and helpful to do so.

(1) That the defendant owed plaintiff a duty of full disclosure. This duty could be part of a general fiduciary duty owed by the defendant to the plaintiff. This duty could also arise, even though it might not exist in the first instance, once a defendant voluntarily chooses to speak to plaintiff about a particular subject matter;
(2) That the defendant misstated a fact or failed to disclose a fact to plaintiff;
(3) That the defendant's misstatement or omission was material;
(4) That plaintiff relied on defendant's material misstatement or omission; and
(5) That plaintiff suffered damages as a result of defendant's material misstatement or omission.

*Specialty Beverages, L.L.C.*, 537 F.3d at 1180-81 (internal quotation omitted) (applying Oklahoma law). Those elements can be summarized as (1) duty, (2) misstatement or omission, (3) materiality, (4) reliance, and (5) damages.[4]

In the First Amended Complaint, LWS has asserted a limited theory of constructive fraud related to Stobaugh/Higgins' presentation of the NCAs – namely, that "Stobaugh and Higgins took actions that voided the employment agreements and thus knew or should have know that the employment agreements provided to the appraisers were void" and that this "presentation of voided documents to the appraisers constituted constructive fraud." (First Am. Compl. ¶ 75.) The Court concludes that LWS has presented sufficient evidence to reach a jury on this constructive fraud theory. First, by virtue of the SASA, a jury could conclude that Stobaugh and Higgins owed LWS a duty of full disclosure. The Court need not decide whether Stobaugh and Higgins owed a status-based duty of disclosure because they "voluntarily chose" to provide information on the same subject matter as the alleged fraud – namely, the NCAs. This is sufficient to survive summary judgment as to the "duty" element.

Second, LWS has presented sufficient evidence that Stobaugh and Higgins "misstated a fact"– namely, that the NCAs would continue beyond August 2010 and/or "failed to disclose a fact"

_____

[4]  Based on the above law, the Court does not presently intend to instruct in strict accordance with Oklahoma Uniform Jury Instruction 18.2, which requires intent of creating a false impression of the actual facts.

– namely, that they had reduced salaries in violation of the Addendums.  There is evidence in the summary judgment record that such misrepresentation/omission occurred (1) via emails sent to Lampton and the Appraisers by Stobaugh and Higgins' agents – namely Steve Stobaugh and/or Steve Ray;  and/or (2) during the interviews with the Appraisers.   Contrary to Defendants' arguments, the Court considers the alleged misstatement and/or concealment to be one of fact rather than of law.  The crucial misrepresented or non-disclosed fact is the salary reduction.  Further, even assuming the alleged misstatement/non-disclosure could be considered one of law, *i.e.*, the legal validity or invalidity of the NCAs, it carried with it express or implied facts regarding the absence of any reductions of the salaries set forth in the Addendums.  *See generally* 37 Am. Jur. Fraud, § 100 ("A misrepresentation of law may be a basis for an action for fraud if it includes express or implied misrepresentations of fact.").

Third, Defendants again argue that no constructive fraud occurred because the NCAs were unenforceable under the common law and for reasons other than the alleged factual misrepresentation/omission regarding salary reductions.  Presumably, this argument attacks the elements of materiality and damages, *i.e.*, if the NCAs were unenforceable for other reasons, the alleged fraud could not have been material to the appraisal and could not have caused LWS any harm.  However, LWS has presented sufficient evidence to survive summary judgment as to the elements of materiality and damages.  Appraiser Donald Chesser testified that, had he known, *inter alia*, that the NCAs were void due to salary reductions, his appraisal would have "reflected these increased risk factors" and he "would have reduced the appraisal value of the Alloy stock."  (Pl.'s Resp. to Summ. J., Ex. O.)  Further, Stobaugh and Higgins both testified that the original purpose of the NCAs was to add value to the company.  This indicates that the alleged constructive fraud could have been material to the valuation and could have caused damage to LWS.

Finally, Defendants contend that no constructive fraud occurred because Lampton was factually aware of the salary reductions and/or that Lampton had full and equal access to salary records and could have ascertained that Hyle and Stamps' salaries had been temporarily reduced in 2009. Defendants cited no law in support of this argument, (*see* Stobaugh's Mot. for Summ. J. 11, Stobaugh's Reply in Support of Mot. for Summ. J.), and the Court is uncertain if Defendants intend to challenge the "reliance" element or assert this as an affirmative defense.

The Court finds that Defendants are not entitled to summary adjudication on the constructive fraud claim based on Lampton's own failures to discover the truth regarding the 2009 salary reductions and such reductions' effects on the NCAs. First, Defendants have not cited law specifically applying this type of defense in a constructive fraud case, where the defendant has a potential duty of disclosure. Second, assuming such defense does apply to constructive fraud, questions of fact exist as to whether Lampton was factually aware of the salary reductions. In his deposition, Lampton denied ever being told of the salary reductions, although Stobaugh and Higgins testified that they informed him. In addition, questions of fact exist as to whether Stobaugh/Higgins' presentation of the NCAs as responsive to § 3(c)(v) of the SASA somehow diverted LWS from engaging in any further inquiry. *See generally RMA Lumber, Inc. v. Pioneer Machinery, LLC*, No. 6:08-CV-00023, 2009 WL 3172806, at *6 (W.D. Va. Oct. 1, 2009 (applying Virginia law) (explaining that a duty to investigate is relieved in constructive fraud case "if the seller's conduct diverts the buyer from engaging in further inquiry"). The SASA is a unique fact that makes it more reasonable that Lampton/LWS/the Appraisers relied upon the NCAs as enforceable agreements without conducting their own search of past salary records. Further, it must be remembered that the salary reduction was only temporary, and Hyle and Stamps' salaries at the time of the stock sale met or exceeded those set forth in the Addendums. Therefore, Stobaugh and Higgins are not entitled to

24

summary adjudication based upon LWS's failures to ascertain the truth regarding the salary reductions.

### 2.    Actual Fraud

The elements of actual fraud  are: "1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false or is made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied on by the other party to his (or her) own detriment."  *Bowman v. Presley*, 212 P.3d 1210, 1218 (Okla. 2009) (using term "actionable fraud" in a way that appears to be synonymous with "actual fraud," as that term is used in other Oklahoma Supreme Court cases); *Howell v.  Texaco, Inc.*, 112 P.3d 1154, 1161 (Okla. 2004) (explaining that "[a]ctual fraud is a material false representation, made with knowledge of its falsity or recklessly without knowledge as to its truth or falsity, as a positive assertion, with the intention that it be acted upon by another") (internal quotations omitted).  Although these elements seem to be limited to "false material misrepresentations," the Oklahoma Supreme Court has also repeatedly stated that "actual fraud" may be premised upon an "intentional concealment."  *See Manokoune*, 45 P.3d at 1086 (defining "actual fraud" as the "intentional misrepresentation or concealment of a material fact which substantially affects another person.").[5]

Because it is difficult to prove by direct evidence, courts recognize that fraud is most often proved by circumstantial evidence.  *Austin v. Wilkerson, Inc.*, 519 P.2d 899, 904 (Okla. 1974) (internal quotation omitted).  "Facts of trifling importance when considered separately, or slight circumstances trivial and inconclusive in themselves, may afford clear evidence of fraud when

---

[5]  The Oklahoma Uniform Jury Instructions do not include intentional concealment as means of committing fraud, in the absence of a duty to disclose.  *See* Okla. Unif. Jury Instr. 18.1, 18.2, 18.6.  However, this seems contrary to certain other statements in Oklahoma law, and the Court concludes, at least for purposes of summary judgment, that "intentional concealments" by Stobaugh are relevant to the actual fraud claim.

considered in connection with each other." *Id.* (internal quotation omitted). "It has been said that in most cases fraud can be made out only by a concatenation of circumstances, many of which in themselves amount to very little, but in connection with others made a strong case." *Id.* at 904-905.

### a.     Stobaugh

With respect to actual fraud committed by Stobaugh, LWS has presented evidence of the following misrepresentations and/or concealments: (1) presentation of the NCAs as enforceable and continuing agreements; (2) concealing that Hyle and approached Stobaugh in December 2010 and informed Stobaugh that Hyle was considering starting a new welding supply business when the Alloy stock sale was complete; (3) concealing that Hyle asked Stobaugh if he would join him in a new welding supply business; (4) concealing that two customers had terminated their bulk gas sales contracts in 2009; and (5) concealing that in early January 2011, Stobaugh learned Hyle, Stamps, Stobaugh's son and Stobaugh's wife, had entered into a contract to purchase commercial property in Sapulpa, Oklahoma from which TGG would ultimately operate. All these misrepresentation/omissions are adequately supported by the summary judgment record, including Stobaugh's own deposition testimony.

LWS has also presented undisputed evidence that Stobaugh, immediately following the stock sale, (1) signed as a purchaser on the commercial property, (2) began operating TGG along with former Alloy employees, and (3) TGG currently sells it products to numerous former Alloy customers. This evidence is the type of circumstantial evidence that, taken together, could lead a jury to conclude that Stobaugh committed actual fraud in conjunction with the stock sale. For the same reasons explained above with respect to constructive fraud, LWS has presented sufficient evidence to create a question of fact on the elements of materiality and damages.

With respect to LWS's "duty to investigate" actual fraud in order to avoid harm, there appears to be law supporting both parties' arguments. *Compare Greene v. Humphrey*, 274 P.2d 535, 537-38 (Okla.1954) ("When it appears that one has been guilty of intentional and deliberate false statements, by which to his knowledge another has been misled and influenced in his action, he cannot escape the legal consequences of his fraudulent conduct by saying that the fraud might have been discovered had the party whom he deceived exercised ordinary care and diligence.") (internal quotations omitted), with *Silver v. Slusher*, 770 P.2d 878, 882 n.8 (Okla. 1988) ("An action for fraud may not be predicated on false statements when the allegedly defrauded party could have ascertained the truth with reasonable diligence.") ("Where the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he had been deceived by the vendor's misrepresentations.") (internal quotations omitted).  Assuming that *Silver* sets forth the correct law, Stobaugh is not entitled to summary adjudication because his alleged actual fraud includes facts to which Lampton/LWS did not have equal access and which could not have been ascertained with an exercise of due diligence – namely, facts regarding the commercial property contract, the conversation with Hyle, certain Alloy employees' intentions to leave following the stock sale, his own intention to join TGG following the stock sale, and the risk of immediate competitive encroachment by TGG.  The summary judgment evidence creates a question of fact as to whether Stobaugh knew such facts at the time he assisted with the appraisal process.

b.       **Higgins**

With respect to actual fraud committed by Higgins, LWS relies upon the same evidence as that supporting the constructive fraud claim – namely, Higgins' misstatement or omissions regarding the NCAs and the 2009 salary reductions.  Unlike Stobaugh, there is no evidence that Higgins made any other misrepresentation or nondisclosures during the appraisal process.  Further, unlike with Stobaugh, there is no circumstantial evidence that would support a finding of an intentional or even reckless deception committed by Higgins in conjunction with presentation of the NCAs to the Appraisers.  The summary judgment evidence shows that, in 2009, Alloy was experiencing economic problems and that it reduced salaries of all employees, not just Hyle and Stamps.  Higgins testified that he did not, at the time of the 2009 salary reductions, realize that this would impact Hyle and Stamps' NCAs.

LWS has not presented any countervailing circumstantial evidence – such as that discussed above with respect to Stobaugh – that casts doubt on Higgins' testimony or that could lead a jury to conclude that Higgins actually acted intentionally or recklessly when he caused the NCAs to be presented to LWS and the Appraisers.  There is no evidence that Higgins had any information about the possible formation of TGG, the contract for purchase of commercial property, or that key Alloy employees planned to leave after the Alloy stock sale.  There is no evidence that Higgins has operated, managed, consulted for, or been employed by TGG after the stock sale.  Instead, it is undisputed that Higgins retired following the sale.  Further, Lampton himself testified in his deposition that he did not believe he had been intentionally misled by Higgins in any way.  Although the First Amended Complaint implies that Stobaugh and Higgins somehow acted in concert to defraud LWS, the summary judgment evidence simply does not support such allegation.  The Court concludes that the evidence against Higgins is insufficient to support a finding of any intentional or

even reckless deception in conjunction with the NCAs and that Higgins is entitled to summary judgment as to the actual fraud claim.

### F.   Breach of Fiduciary Duty (Stobaugh)[6]

Both LWS and Stobaugh moved for summary judgment on the breach of fiduciary duty claim, and such motions are addressed simultaneously in this section.  In order to recover for breach of fiduciary duty, LWS must establish: (1) a fiduciary relationship existed between LWS and Stobaugh, such that one or more fiduciary duties flowed from Stobaugh to LWS; (2) Stobaugh breached a fiduciary duty owed to LWS; and (3) such breach was the direct cause of damages to LWS.  Okla. Unif. Jury Instr. 26.1 (citing *FDIC v. Grant*, 8 F. Supp.2d 1275, 1299 (N.D. Okla. 1998), but combining first and second elements from *Grant* decision "because the existence of a fiduciary relationship will create one or more fiduciary duties as a matter of law").

### 1.   Duty Based on Stobaugh Being on "Both Sides of the Transaction"[7]

Lampton's principle legal argument is that a fiduciary duty, and even heightened fiduciary duties, attached to the stock sale because Stobaugh was "on both sides of the transaction."  *See Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 898 (Del. Ch. 1999) ("It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.") (internal quotations omitted).  If a corporate director stands on "both sides" of a transaction, he must

---

[6]  There is no breach of fiduciary duty claim asserted against Higgins in the First Amended Complaint.  (*See* First Am. Compl. ¶¶ 82-86).  LWS's statement to the contrary, (*see* Pl.'s Mot. For Partial Summ. J. n.1), appears to be in error.

[7]  For clarity, the Court will separately analyze all possible "duty" theories that are implicated by LWS's arguments.

prove that his conduct satisfied the "entire fairness standard," which includes inquiries into fair dealing and fair price.  *Id.*[8]

LWS cannot demonstrate that Stobaugh was "on both sides" of the stock sale.  The sale was an ordinary sale from a corporate director/shareholder to an existing shareholder.  LWS and Stobaugh did not have any identity of interests.  In fact, they both had lawyers and were engaged in pending litigation at the time of the stock sale.  They both had every incentive to act as normal buyers and sellers.  When an officer is acting for himself and not for the corporation when he buys or sells stock, he is not acting on "both sides of the transaction."  *See Jernberg v. Mann*, 358 F.3d 131, 138 (1st Cir. 2004) (holding that corporate officer was not "acting for the corporation" when she purchased stock from the sole shareholder of a corporation and therefore was neither "self-dealing" nor "on both sides" of the transaction) (explaining that enhanced fiduciary duties "relate to an officer's duty to the corporation, not the officer's duty to an individual shareholder during a private stock sale").

The cases cited by LWS are factually distinguishable and do not support a finding that Stobaugh was somehow "on both sides" of the stock purchase.  In *Boyer*, one corporation sold all of its assets to another corporation.  The selling corporation had eight directors, and five of them voted in favor of the sale. Those same five directors were stockholders, or had contracts to become stockholders, of the buying corporation.  It was undisputed that a principal purpose of the sale was to eliminate the plaintiff and one other stockholder from continued participation in the corporation. Under these circumstances, the directors were clearly on both sides of the transaction because they were, for all practical purposes, the buyer and the seller.  LWS's other cited cases are also

---

[8]  For purposes of this motion, the Court assumes that this Delaware law is applicable in Oklahoma.

distinguishable. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (parent corporation deemed to be on "both sides" of a cash-out merger between parent and subsidiary where parent/subsidiary shared common directors, parent drafted document setting forth fair price of stock, parties did not negotiate price or engage in an arm's length transaction, and common directors between parent and subsidiary did not abstain from vote); *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1333 (Del. Ch. 1987) (presenting similar facts as those in *Weinberger*) ("It is undisputed that Sealy's parent corporation, and its directors who are employees of and are controlled by Sealy's majority stockholder, stood on both sides of the proposed merger and fixed its terms.").

### 2. Duty Based on Corporate Officer/Shareholder Relationship

When handling the property of the corporation, a corporate officer owes a fiduciary duty to the corporation and its stockholders. *Adams v. Mid-West Chevrolet Corp.*, 179 P.2d 147, 156 (Okla. 1947) ("The general rule is that officers and directors in control of a corporation occupy toward the corporation and its stockholders, in respect to the business or property of the corporation, a fiduciary relation somewhat in the nature of a trusteeship and cannot deal with the property of the corporation for their own personal benefit or advantage."); *see generally Warren v. Century Bankcorporation, Inc.*, 741 P.2d 846, 849 (Okla. 1987) ("[C]orporate directors stand in a fiduciary relationship to their corporation and its stockholders."). However, "this duty does not extend to the outstanding stock of the corporation for the reason that such stock is the individual property of the respective stockholders and not in any sense the corporation's property." *Adams*, 179 P.2d at 156. This is because the corporation "has no interest in the outstanding stock or in dealings among the stockholders with respect thereto . . . ." *Id.*; *Jernberg,* 358 F.3d at 136 (applying Massachusetts law) ("Absent special circumstances, an officer or director has no fiduciary duties in purchasing or selling

stock . . . .") (internal quotations omitted); 3A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations*, § 1168.10 ("[D]irectors do not occupy a trust relation with shareholders with respect to their shares because dealing in the corporation's stock is not a corporate function . . . .").

In this case, Stobaugh was selling his individually-owned stock to LWS and was not dealing in corporate assets. Further, there is no evidence that LWS utilized Alloy funds to purchase the stock, such that it was actually a transaction between Stobaugh and Alloy. *Cf. Jordan v. Hunter*, 865 P.2d 990, 996 (Idaho App. 1993) (citing general rule that corporate officer does not owe any fiduciary duty with respect to sale of his individually owned stock, but explaining exception where corporate funds are used for purchase) ("It is well settled that where an officer is dealing with the corporation, even where the latter is represented by other directors or officers, the officer is under a duty of good faith and fair dealing."). Thus, fiduciary obligations did not flow from Stobaugh to LWS based on their relationship as corporate officer/stockholder.

### 3.  Duty Based on "Majority" Shareholder/Minority Shareholder Relationship

Under Oklahoma law, "a majority shareholder has a fiduciary duty not to misuse his power by promoting his personal interests at the expense of the corporation, and the majority shareholder has the duty to protect the interests of the minority." *Renberg v. Zarrow*, 667 P.2d 465, 472 (Okla. 1983). However, Stobaugh is not a "majority shareholder" in relation to LWS. At the time of the alleged breach of fiduciary duty, Stobaugh owned 30% of Alloy's stock, Higgins owned 30% of Alloy's stock, and LWS owned 40% of Alloy's stock. LWS repeatedly referred to Stobaugh in its brief as a "majority shareholder" based on its treatment of Stobaugh and Higgins as one individual with a 60% interest. LWS treated them as one shareholder without citation to authority and without any evidence that Stobaugh and Higgins were somehow acting in concert to complete the alleged self-dealing. Although Stobaugh and Higgins were both officers of the corporation and were both

selling their shares, a breach of fiduciary duty is a tort that must be assessed individually with respect to each officer, and the Court finds no legal or factual basis for combining Stobaugh and Higgins' ownership interest in order to deem Stobaugh a "majority" shareholder. Thus, a fiduciary relationship did not arise based on Stobaugh's status as a "majority" shareholder who misused his power at the expense of a "minority" shareholder.

### 4. Duty Based on Factual Circumstances

For reasons explained above, no fiduciary duty arose because Stobaugh placed himself on both sides of the transaction or based on Stobaugh and LWS's relationship to one another during the stock purchase. Where there is no status-based fiduciary duty that can be found as a matter of law by the court, a jury may nonetheless decide whether a fiduciary relationship exists. *See* Okla. Unif. Jury Instr. 26.2 (explaining that third instruction permitting jury finding of fiduciary relationship "should be used where the existence of a fiduciary relationship is a jury question and the fiduciary relationship does not fit into a well-defined category," such as the relationship of guardian and ward, attorney and client, principal and agent, or where defined by statute); *Lowrance v. Patton*, 710 P.2d 108, 111-12 (Okla. 1985) ("It is settled law that courts of equity will not set any bounds to the facts and circumstances out of which a fiduciary relationship may spring."). This type of fiduciary relationship is fact-driven and arises "whenever trust and confidence are reasonably placed in the integrity and loyalty of another, and the other person knowingly accepts that trust and confidence and then undertakes to act on behalf of the person." Okla. Unif. Jury Instr. 26.2; *see also MidAmerica Fed. Sav. and Loan Ass'n v. Shearson/American Exp., Inc.*, 886 F.2d 1249, 1257 (10th Cir. 1989) (explaining that a fiduciary relation "appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence or trust, justifiably reposed, in both an unfair advantage is possible").

The Court finds that LWS, while not entitled to summary adjudication on the issue of duty, has presented sufficient evidence to create a jury question. First, LWS has presented evidence of a contractual agreement to disclose information that may justify its placing a certain degree of trust in Stobaugh.  The evidence shows that Stobaugh knew more about Alloy's daily operations than LWS and had greater knowledge of and access to information needed by the Appraisers.  Further, LWS obtained an agreement for Stobaugh's full cooperation during the stock sale, presumably because Lampton knew that Stobaugh had superior knowledge of operations and was in a position to manipulate the value of the stock.  Second, LWS has presented evidence that Stobaugh may have been in exclusive possession of facts and information relevant to the stock sale, which can itself support a finding of a fiduciary relationship when a corporate director sells his stock to a shareholder.  *See* 3A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations*, § 1168.10 (explaining exception to general rule of non-fiduciary relationship during private stock sale where the corporate officer/seller has "special information" to which buyer/shareholder lacks access).  Because there exist questions of fact as to at least one element, LWS and Stobaugh's motions for summary adjudication on the breach of fiduciary duty claim are both denied.

### G.      Unjust Enrichment (Stobaugh, Higgins)

Defendants' only argument is that LWS has adequate remedies at law.  However, this does not entitle Defendants to summary adjudication.  LWS's unjust enrichment claim is properly pled in the alternative in the event that LWS is found to have no legal remedies.

### H.      Injunctive Relief (Stobaugh, Higgins, TGG)

LWS's claim for injunctive relief is based entirely on its claim for breach of implied contract. (*See* Pl.'s Resp. to Stobaugh's Mot. for Summ. J. 32.)  Because LWS's breach of implied contract claim fails as a matter of law, *see supra* Part II.C, LWS has no legal basis for its request for injunctive relief.  Therefore, Defendants are granted summary adjudication on LWS's claim for injunctive relief.

## III.     Conclusion

Defendants' Motion to Dismiss First Amended Complaint (Doc. 43) is DENIED.  LWS's Motion for Partial Summary Judgment (Doc. 46) is DENIED. Defendants Stobaugh and TGG's Motion for Summary Judgment (Doc. 48) is GRANTED IN PART AND DENIED IN PART as set forth herein.  Specifically, such motion is GRANTED in its entirety as to TGG, and TGG is terminated as a party.  It is GRANTED as to LWS's claims against Stobaugh for breach of implied contract and injunctive relief and denied as to all other claims.  Defendant Michael Higgins' Motion for Summary Judgment (Doc. 49) is GRANTED IN PART and DENIED IN PART as set forth herein.  Such motion is granted as to LWS's claims against Higgins for breach of implied contract, actual fraud, and injunctive relief and denied as to all other claims.

The parties are ordered to submit a revised proposed pretrial order no later than Monday, November 5, 2012, at 4pm that is in accordance with this Opinion and Order.  The parties' deadline for submitting proposed jury instructions, voir dire, and trial briefs is extended to Wednesday, November 14, 2012.

**SO ORDERED this 2nd day of November, 2012.**

*Terence Kern*

**TERENCE KERN**
**United States District Judge**

35